UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| YAPI BONIFON, <br><br> Plaintiff, <br><br> v. <br><br> LEON RODRIGUEZ, *in his official capacity as District Director for U.S. Citizenship and Immigration Services*, et al., <br><br> Defendants. | Civil Action No. 15-cv-13653-ADB |

**MEMORANDUM AND ORDER
GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

BURROUGHS, D.J.

Plaintiff Yapi Bonifon brings this action seeking *de novo* review of his application for naturalization pursuant to § 310(c) of the Immigration and Nationality Act, 8 U.S.C. § 1421(c) and the Administrative Procedure Act, 5 U.S.C. § 702 *et seq*. Now before the Court is a motion for summary judgment filed by government defendants Jeh Johnson, Denis Riordan, and Leon Rodriguez [ECF No. 26]. For the reasons set forth below, the motion for summary judgment is granted.

## I. BACKGROUND

### A. Factual Background

Yapi Bonifon is a native of Côte D'Ivoire ("Ivory Coast"). In 1998, when he was 23 years old, Bonifon obtained passage from Ivory Coast to the United States aboard a large container ship that was transporting cargo. The voyage lasted approximately 30 days, and Bonifon arrived in the United States on or around September 20, 1998.

Bonifon initially traveled from his hometown of Akoupe, Ivory Coast, to the port city of Abidjan, Ivory Coast. He knew that large ships departed from Abidjan and he intended to leave the country. He packed a backpack with sugar, water, biscuits, and bread, which he believed were foods that would prevent him from needing to use the restroom frequently. Before boarding the ship in Abidjan, Bonifon observed the ship's activity to determine how to gain access.

Bonifon has provided differing accounts as to how he boarded the ship. In a 2005 affidavit provided to immigration officials, Bonifon stated that he pretended to be an employee. In his deposition for this case, he elaborated, explaining that he took a broom from an area where several brooms were located and swept the floor of the ship alongside the ship's crew members. In his naturalization interview, Bonifon did not mention pretending to be a worker, but rather stated that he sneaked aboard the ship at night.[1] Bonifon boarded the ship in the evening. He never obtained permission from the owner, captain, a crew member, or anyone else to be on the ship, nor did he pay anyone, sign any documentation, or possess a valid ticket to be on the ship. He did not have a valid passport from any country, nor did he have a visa to travel to the United States.

Soon after boarding the ship, Bonifon took a jumpsuit from a dressing room and wore it so that he would look like the other workers. He stated that he situated himself "among the crew" and suggested he was not detected because he was shorter than other crew members. In addition, Bonifon testified that he had at least one short conversation with another crew member in which he pretended to be a worker. Bonifon did not sweep the floors after the first night on the ship.

Bonifon found a space on the second floor of the ship where he slept and spent most of his time. His sleeping location was not near any other people, and he was careful to avoid the

---

[1] Bonifon contests the admissibility of this interview, but as discussed *infra*, the discrepancy is not material to the legal question at issue.

crew members out of concern that they would throw him overboard if they discovered he was not an employee. He never went above deck. He testified that he did not interact much with the crew, and that nobody asked him who he was or what he was doing on the ship. He was able to use the public restrooms.

During his journey, Bonifon discovered how to access the ship's kitchen without drawing attention to himself. He explained that he would wait until after a meal was over, when most people had left the kitchen, and then he would enter the kitchen quietly, take some fruit that could "disappear" in his mouth, put a small amount of food in his pocket, and then leave quickly. He described this process as "grab[bing] the food" and then "disappear[ing]." Bonifon stated that sometimes he would say "hey" to people in the kitchen to be polite, but otherwise he did not speak to anyone. After taking food, he would walk back to his sleeping area "carefully" so that nobody would follow him. No one ever gave him food.

On or about September 20, 1998, the ship arrived in Miami, Florida, and Bonifon disembarked during the night. He stated that he might have done something to pretend he was part of the crew as he was departing, such as rolling barrels, but he did not recall with certainty. He was not inspected by any authority, and he did not speak to any immigration officer.

B.     **Procedural Background**

Bonifon married Linda (Crosby) Bonifon in April 2001, and his wife subsequently filed a Form I-130 petition to establish her spousal relationship with Bonifon so he could seek lawful permanent resident status. The I-130 petition was approved in November 2001. In December 2001, Bonifon filed a Form I-485 application to Register Permanent Residence or Adjust Status. In response to his application, United States Citizenship and Immigration Services ("USCIS") requested additional evidence from Bonifon. He submitted an affidavit dated June 20, 2005 in

which he described his journey to the United States. On September 8, 2006, USCIS approved Bonifon's I-485 Application and granted him lawful permanent resident ("LPR") status under 8 U.S.C. § 1255(i).

Bonifon applied to become naturalized as a United States citizen by submitting a Form N-400 application on August 30, 2013. He was interviewed in connection with his application twice, by USCIS Immigration Services Officer ("ISO") Joel Dorfman on May 7, 2014, and by ISO Eric Labato on July 15, 2014. Bonifon's attorney was present for both interviews. Bonifon and his attorney walked out of the May 7 interview before it was complete, and returned to finish the interview on July 15. At the beginning of the July 15 interview, Bonifon was placed under oath. After the interview was completed, Bonifon and his attorney were permitted to review the statement, and both of them signed the statement to certify that the statement was true and correct.

USCIS denied Bonifon's application for naturalization the same day as the second interview, explaining that he was inadmissible as a stowaway and thus had not been lawfully admitted for permanent residence. Bonifon administratively appealed the decision. He appeared at an appeal hearing on June 2, 2015. On August 5, 2015, USCIS affirmed its decision to deny Bonifon's N-400 application because he entered the United States as a stowaway and thus was not lawfully admitted. On October 27, 2015, Bonifon sought judicial review of the USCIS decision in this Court.

## II. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56. The Court must view "the facts in the light most agreeable to the nonmoving party and draw all reasonable inferences in that party's favor." Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011). "An issue is 'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either party," and a "fact is 'material' if its existence or nonexistence has the potential to change the outcome of the suit." Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 4–5 (1st Cir. 2010). The substantive law determines which facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id.; see also Commodity Futures Trading Comm'n v. JBW Capital, LLC, 812 F.3d 98, 110 n.19 (1st Cir. 2016) (quoting Anderson, 477 U.S. at 247–48).

### B. Whether Bonifon Was a Stowaway

Bonifon argues that he does not meet the definition of a stowaway, and thus, he is not precluded from naturalization. The government maintains that USCIS was correct in classifying him as a stowaway, which makes him ineligible for naturalization.

"'[I]t has been universally accepted that the burden is on the alien applicant to show his eligibility for citizenship in every respect.'" INS v. Pangilinan, 486 U.S. 875, 886 (1988) (quoting Berenyi v. INS, 385 U.S. 630, 637 (1967)). "Because citizenship confers 'privileges and benefits,' and, 'once granted, cannot lightly be taken away,' any 'doubts [about Petitioner's citizenship] should be resolved in favor of the United States and against'" the petitioner. Walker v. Holder, 589 F.3d 12, 18–19 (1st Cir. 2009) (quoting Berenyi, 385 U.S. at 637). "[N]o person shall be naturalized unless he has been lawfully admitted to the United States for permanent residence." 8 U.S.C. § 1429. "The term 'lawfully admitted for permanent residence' means the

5

status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws . . . ." 8 U.S.C. § 1101(a)(20).

Pursuant to 8 U.S.C. § 1182(a)(6)(A)(i), "[a]n alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible." Bonifon sought LPR status pursuant to 8 U.S.C. § 1255(i), which provides an exception to § 1182 "for 'certain grandfathered aliens' who would otherwise be ineligible to adjust status because they entered without inspection or are otherwise precluded from availing themselves of the more common form of adjustment of status." Agyei v. Holder, 729 F.3d 6, 9 (1st Cir. 2013); see also Matter of Estrada, 26 I. & N. Dec. 180, 183 (B.I.A. 2013). This provision is available to an alien who is the beneficiary of a petition for classification under 8 U.S.C. § 1154 that was filed on or before April 30, 2001. 8 U.S.C. § 1255(i)(1)(B). Bonifon was the beneficiary of such a petition. A "grandfathered" alien, however, must still demonstrate that he "is eligible to receive an immigrant visa and is admissible to the United States for permanent residence," and that "an immigrant visa is immediately available to the alien at the time the application is filed." Id. § 1255(i)(2).

Under 8 U.S.C. § 1182(a)(6)(D), "[a]ny alien who is a stowaway is inadmissible." Although § 1255(i) provides a limited exception to the category of aliens who are ineligible for admission because they are present in the United States without being admitted, an exception for which Bonifon qualified, there is no comparable exception for stowaways. "[S]towaways are a particularly disfavored category of aliens." Linea Area Nacional de Chile S.A. v. Sale, 865 F. Supp. 971, 980 (E.D.N.Y. 1994); see also Succar v. Ashcroft, 394 F.3d 8, 13 (1st Cir. 2005) (noting that Congress created "special removal proceedings" for two types of individuals arriving in the United States: suspected terrorists and stowaways). Thus, Bonifon is not eligible for

naturalization if he is properly classified as a stowaway.

Bonifon argues that he was not a stowaway because he did not physically conceal himself for the entirety of his voyage on the ship. He points to his deposition testimony in which he stated that he pretended to be a worker, helped sweep the deck, occasionally interacted with crew members, used the ship's public restrooms, and took food from the kitchen while others were present. Bonifon also claims that there is a material dispute of fact that renders summary judgment inappropriate, but even if the Court considers only the facts that Bonifon views as most favorable, and disregards the testimony he sees as unfavorable,[2] it is clear that Bonifon meets the definition of a stowaway.

The Immigration and Nationality Act defines the term "stowaway," at 8 U.S.C. § 1101(a)(49), to mean "any alien who obtains transportation without the consent of the owner, charterer, master or person in command of any vessel or aircraft through concealment aboard such vessel or aircraft," and notes that "[a] passenger who boards with a valid ticket is not to be considered a stowaway." USCIS employed this definition in its July 15, 2014 letter denying Bonifon's naturalization application and in its August 5, 2015 letter reaffirming the denial. [ECF Nos. 28-4, 28-6]. Before the term was defined by statute, the courts utilized a definition that included the same fundamental elements. See United States ex rel. Candreva v. Smith, 27 F.2d 642, 644 (7th Cir. 1928) (explaining that the "general dictionary definition" of a stowaway is "[o]ne who conceals himself aboard an outgoing vessel for the purpose of obtaining free passage"); The Western World, 31 F. Supp. 340, 341 (E.D.N.Y. 1940) ("[A] stowaway is one who conceals himself aboard an outgoing vessel for the purpose of obtaining free passage."

---

[2] In particular, as discussed *infra*, Bonifon raises concerns about the circumstances of his July 15, 2014 interview with ISO Eric Labato, in which he stated that he "sneaked" aboard the ship at night, hid below deck so that nobody could find him, avoided detection, and disembarked from the ship at night when nobody could see him. See [ECF No. 28-8].

(citing 60 Corpus Juris, 130; Candreva, 27 F.2d at 644); United States v. Sandrey, 48 F. 550, 551 (C.C.E.D. La. 1891) ("It may be noticed that a 'stowaway' is one who conceals himself on board a vessel about to leave port in order to obtain a free passage.").

Regardless of the precise formulation of the definition of "stowaway," Bonifon satisfies the definition. Bonifon does not dispute that he did not have permission to be on the ship and that he obtained free passage by means of deception. Rather, he argues that he was not "concealed." Bonifon asserts that concealment is defined only as "physical" concealment, but he cites no authority to support this proposition, nor is the Court aware of any. Black's Law Dictionary defines concealment as: "1. The act of preventing disclosure or refraining from disclosing; esp., the injurious or intentional suppression or nondisclosure of facts that one is obliged to reveal; cover-up," or, "2. The act of removing from sight or notice; hiding." *Concealment*, Black's Law Dictionary (10th ed. 2014). Similarly, the Merriam-Webster dictionary first defines conceal as "to prevent disclosure or recognition of," such as to "conceal the truth," and, second, "to place out of sight." *Conceal*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/concealment (last visited Sept. 8, 2017). Thus, while physically hiding is a form of concealment, it is not the only way to conceal. Obfuscating the truth also constitutes concealment. Bonifon did not disclose the fact that he did not have permission to be on the ship, and he actively obscured the truth by pretending to be a crew member and by avoiding other people when possible. Thus, Bonifon obtained his passage through concealment.[3]

While the Court is not aware of any cases that address this precise issue, the caselaw indicates that this is the correct outcome. For example, in Candreva, an individual boarded a ship

---

[3] In addition, the Court notes that Bonifon has not disputed that he physically concealed himself during much of the journey, by, for example, sleeping and living in an area of the ship away from other people, avoiding talking to crew members, and attempting to take food at a time when he was less likely to be followed.

and then met two crew members who said they would take him to the United States; he paid them $150 for passage, and he worked and received meals, but he did not sign on to the ship's crew and was not sure whether the captain knew of his presence. 27 F.2d at 643. The court determined that the individual was properly classified as a stowaway, reasoning that what he received in exchange for the money he paid was not passage, which the crew members were not entitled to contract for, but rather "some unexplained artifice to keep his presence on the ship unknown to the responsible officers." Id. at 644. In contrast, Bonifon's argument that he was not a stowaway is markedly weaker: he did not pay anyone for his passage, no person on the ship knew that he lacked permission to be onboard, he did no real work, and he was not given any food. Thus, if the individual in Candreva was a stowaway, Bonifon certainly is as well. See also The Laura Madsen, 112 F. 72, 72 (D. Wash. 1901) (where individual hiding on ship was discovered and forced to sign shipping articles to serve as a member of the crew, he remained a stowaway); M/V S. African Victory, 12 I. & N. Dec. at 256 (individuals who boarded ship in search of food, fell asleep, and did not wake up until ship was at sea did not intend to steal passage and thus were not stowaways).

### C. USCIS's Prior Decisions

Bonifon next appears to argue that, because USCIS found him eligible for LPR status, despite being aware of the possibility that he was a stowaway, it cannot now assert that he is ineligible for naturalization because he was a stowaway. This is not an accurate reflection of the law. First, Bonifon has specifically invoked the Court's power to conduct a *de novo* review of USCIS's decision to deny his naturalization application. 8 U.S.C. § 1421(c). Furthermore, to determine whether Bonifon is eligible for naturalization, the Court is required to inquire into whether he was "lawfully admitted" for permanent residence, 8 U.S.C. § 1429, which depends

on whether the granting of his LPR status was both procedurally and substantively proper. See Mejia-Orellana v. Gonzales, 502 F.3d 13, 16 (1st Cir. 2007) ("The natural reading of 'lawful' connotes more than just procedural regularity; it suggests that the substance of an action complied with the governing law." (quoting De La Rosa v. U.S. Dep't of Homeland Sec., 489 F.3d 551, 554 (2d Cir. 2007) and citing Savoury v. U.S. Att'y Gen., 449 F.3d 1307, 1317 (11th Cir. 2006)); Gallimore v. Att'y Gen. of U.S., 619 F.3d 216, 224 (3d Cir. 2010) (holding that "[w]here an alien obtains LPR status through administrative oversight—despite being ineligible for that status for one reason or another," that individual is not "lawfully admitted for permanent residence"). As the Eleventh Circuit explained in Savoury:

> "lawfully admitted" means more than admitted in a procedurally regular fashion. It means more than that the right forms were stamped in the right places. It means that the alien's admission to the status was in compliance with the substantive requirements of the law. What is lawful depends on the law and not on administrative inadvertence or error. The BIA can no more amend or vary a statutory requirement through negligence or mistake than it can do so intentionally in deliberate defiance of a congressional mandate.

Savoury, 449 F.3d at 1317. Thus, the fact that USCIS may have made a mistake in granting Bonifon's application for LPR status does not entitle him to naturalization. Rather, the Court must inquire into whether Bonifon was "lawfully admitted" as a substantive matter, and for the reasons discussed *supra*, because he was a stowaway, he was not lawfully admitted. Accordingly, Bonifon is not eligible for naturalization.

**D.     Estoppel**

Finally, Bonifon argues that USCIS should be estopped from denying his naturalization application because it has engaged in misconduct. Specifically, Bonifon claims that during his first naturalization interview, ISO Dorfman was abusive to him by yelling, badgering, and intimidating him. In addition, Bonifon claims that during his second interview he was suffering

from hypoglycemia, and that ISO Labato took advantage of his diminished physical and mental state to coerce him to make a statement concerning facts he could not remember.

Asserting an estoppel claim against the government is a "difficult[]" endeavor that, if possible, "occurs only in the most extreme circumstances." Dantran, Inc. v. U.S. Dep't of Labor, 171 F.3d 58, 66 (1st Cir. 1999). The proponent must show that the traditional elements of estoppel are present, and also "must 'demonstrate that government agents have been guilty of affirmative misconduct.'" Costa v. I.N.S., 233 F.3d 31, 38 (1st Cir. 2000) (quoting Dantran, 171 F.3d at 67). "The upshot is that a private party who presses for an estoppel against the government must establish (1) the occurrence of affirmative government misconduct (2) engendering a reasonable (though erroneous) belief that a certain state of affairs exists (3) upon which the private party relies to his detriment." Id. (citing Akbarin v. INS, 669 F.2d 839, 842 (1st Cir. 1982)). "Although 'there is no settled test for what constitutes' affirmative misconduct" by the government, "it must at least include 'an affirmative misrepresentation or affirmative concealment of a material fact by the government.'" Shafmaster v. United States, 707 F.3d 130, 136 (1st Cir. 2013) (quoting Ramirez-Carlo v. United States, 496 F.3d 41, 49 (1st Cir. 2007)). "Given the rigors of this gauntlet, it is not surprising that estoppel against the government if it exists at all is hen's-teeth rare." Costa, 233 F.3d at 38 (citing OPM v. Richmond, 496 U.S. 414, 422 (1990) for the proposition that the Supreme Court has "reversed every finding of estoppel [against the government] that [they] have reviewed" (alteration in original)).

Here, Bonifon has not alleged any kind of misrepresentation or concealment of a material fact by the government. His assertion that the government agents engaged in misconduct is founded entirely on the accusation that they were verbally abusive and took advantage of his medical condition to coerce him into making certain statements. Certainly, if these allegations

11

are true, it would represent poor behavior on the part of the agents, but that is not enough to allow Bonifon to assert estoppel against the government. Moreover, Bonifon has not explained how harsh and abusive treatment would have caused him to formulate a reasonable belief that a certain state of affairs existed, or how he relied on that belief to his detriment. Bonifon argues that he detrimentally relied on USCIS's erroneous decision to grant him LPR status ten years ago, but his detrimental reliance must stem from the misconduct claimed—here, the officers' abusive behavior. Therefore, Bonifon has not demonstrated that he is entitled to estop the government from denying his naturalization petition.

## III.  CONCLUSION

Accordingly, the motion for summary judgment filed by government defendants Jeh Johnson, Denis Riordan, and Leon Rodriguez [ECF No. 26] is <u>GRANTED</u>, and their motion to strike Bonifon's sur-reply is <u>DENIED</u> as moot.[4]

**SO ORDERED.**

September 15, 2017                             /s/ Allison D. Burroughs
                                               ALLISON D. BURROUGHS
                                               U.S. DISTRICT JUDGE

---

[4] The government defendants are correct that Bonifon failed to request leave of court to file a sur-reply. Bonifon asserts that his opposition was filed without exhibits due to a clerical error, but the solution to this problem is not to file a sur-reply without leave; rather, he should have moved for permission to file the exhibits (as he eventually did). This issue is not material to the outcome of the case, however.